UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| LATRISHA WINDER,<br>INDIVIDUALLY, AS NEXT FRIEND<br>OF J.W., A MINOR,<br>AND AS PERSONAL<br>REPRESENTATIVE OF THE<br>ESTATE OF STEPHEN WAYNE<br>WINDER, DECEASED, LILY<br>WINDER, STEPHEN TYLER<br>WINDER, AND KOLENE WINDER,<br>AS NEXT FRIEND OF E.W., A<br>MINOR | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |
| PLAINTIFFS | § <br> § | Case No. _____ |
| v. | § <br> § | JURY DEMANDED |
| JOSHUA M. GALLARDO, ROBERT<br>TRAVIS BABCOCK, AND YOUNG<br>COUNTY, TEXAS | § <br> § <br> § <br> § | |
| DEFENDANTS | § | |

# COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

1.      This is a Section 1983 civil rights action for violations of constitutional rights and a civil action for violations of the Americans With Disabilities Act.

2.      On Sunday evening, June 27, 2021, Steve Winder, a husband and father of four, was inside his home in rural Young County, Texas near the city of Graham. Steve and his mother-in-law Lou Anne Phillips were in his bedroom talking. Steve's wife Latrisha Winder was in the United States Army National Guard and was at Fort Lee, Virginia for training.

3.      Steve, who had a history of depression, was intoxicated and emotionally disturbed; he was upset with Latrisha and had threatened suicide to her. Concerned, Latrisha had called her mother Lou Anne, who lived right next to the Winders, and asked her to go over and check on Steve. Steve, who had his handgun near him in the bedroom, discussed the situation with Lou Anne, and after he and Lou Anne had talked through it, Lou Anne believed that Steve was not suicidal and that the situation was under control.

4.      But Latrisha had also called the Young County Sheriff's Office at the behest of an Army chaplain and asked them to do a welfare check on Steve. Sheriff's Deputy Joshua Gallardo, a twenty-three-year-old rookie officer, was dispatched to the Winder home, along with Sheriff's Deputy Simon Dwyer, an experienced officer. They were eating dinner at a restaurant at the time of the dispatch. They had separate patrol vehicles, and because Deputy Gallardo finished eating before Deputy Dwyer, he left the restaurant first.

5.      Deputy Gallardo arrived at the Winder property several minutes before Deputy Dwyer and, with his body cam on, approached the Winder home without displaying any urgency. Deputy Gallardo first ran into Steve's niece Breanna, who was outside her grandmother Lou Anne's home. Breanna, also displaying no urgency or alarm, walked Deputy Gallardo over to the Winders' front porch.

6.      Seemingly at ease with the situation and still not displaying any urgency, Deputy Gallardo asked Breanna to open the front door, but she refused and instead knocked. No one came to the door promptly. Deputy Gallardo, who had either

no training or extremely inadequate training by the Young County Sheriff's Office on how to approach and handle an emotionally disturbed, mentally ill, and armed suicidal man, opened the front door without knocking and made entry into the Winder home in violation of the Fourth Amendment.

7.    Deputy Gallardo encountered Lou Anne, who was stepping outside Steve's nearby bedroom to come to the front door and was starting to tell Deputy Gallardo that they were all right. Steve came to the bedroom doorway, and Deputy Gallardo, mistakenly believing that Steve was pointing a gun at him, shot and killed Steve in violation of the Fourth Amendment. After the shooting, Steve's gun was located approximately thirteen feet from where Steve was standing when he was shot.

8.    Plaintiffs therefore bring this civil action for the violations of Steve's civil rights and to recover damages for Steve's injuries and for their injuries from Steve's wrongful death.

## I.    JURISDICTION AND VENUE

9.    This court has subject matter jurisdiction of this civil action under 18 U.S.C. §§ 1331 and 1343(a)(3, 4).

10.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1, 2). All the parties reside in, or, at the time the events took place, resided in this district, and the events giving rise to the Plaintiffs' claims occurred in this district. Young County is in the Wichita Falls Division of the Northern District of Texas. 28 U.S.C. § 124(a)(6),

## II.   PARTIES

11.    Plaintiff Latrisha Winder is a resident of Young County, Texas, the wife and widow of Stephen W. Winder, the Personal Representative of the Estate of Stephen Wayne Winder, Deceased, and the parent and next friend of J.W., her and Steve's minor daughter.

12.    Plaintiff Lily Winder is a resident of Young County, Texas and the daughter of Steve Winder.

13.    Plaintiff Stephen Tyler Winder is a resident of Young County, Texas and the son of Steve Winder.

14.    Plaintiff Kolene Winder, the parent and next friend of E.W., the minor daughter of Steve Winder, is a resident of Young County, Texas.

15.    Plaintiffs are proper parties to this civil action. *See Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996) ("it is the law of this circuit that individuals who are within the class of people entitled to recover under Texas's wrongful death statute have standing to sue under § 1983 for their own injuries from the deprivation of decedent's constitutional rights"); Tex. Civ. Prac. & Rem. Code. § 71.004(b); *see also Diaz ex rel. Diaz v. Mayor of Corpus Christi*, 121 Fed. App'x 36, 39 (5th Cir. 2005); *Cass v. City of Abilene*, No. 1:13-CV-177-C, 2014 WL 12642539, at *2 (N.D. Tex. Feb. 25, 2014).

16.    Defendant Joshua M. Gallardo is employed by the Young County Sheriff's Office as a Deputy Sheriff and at all relevant times acted as an agent and employee of Young County, Texas under color of law. On information and belief,

Defendant Joshua M. Gallardo is a resident of Young County, Texas. Defendant Joshua M. Gallardo can be served at the Young County Sheriff's Office, 315 N. Cliff Drive, Graham, Texas 76450.

17.     Defendant Robert Travis Babcock is the Sheriff of Young County, Texas and at all relevant times acted as an agent and employee of Young County, Texas under color of law. Defendant Robert Travis Babcock is a resident of Young County, Texas and can be served at the Young County Sheriff's Office, 315 N. Cliff Drive, Graham, Texas 76450.

18.     Defendant Young County, Texas can be served by serving its County Judge, Edwin S. Graham IV, at 516 Fourth Street, Graham, Texas 76450.

### III.     STATEMENT OF FACTS

A. Steve Winder

19.     In June of 2021, at age 39, Steve Winder was a successful auto mechanic. He was employed fulltime at an annual salary of $100,000. Steve and Latrisha Winder had married in 2013, and their daughter J.W. was born in 2014. Steve had three children from his first marriage: two daughters, Lily Winder and E.W., and a son, Stephen Tyler Winder.

20.     Steve and Latrisha lived in rural Young County, Texas near Graham on approximately nine acres of land, and their rural street address was 3640 FM 2652, Graham, Texas. They had a pool, and Latrisha's mother Lou Anne Phillips lived in a house next to Steve and Latrisha's house. In June of 2021, Steve's daughter E.W. was

living with Steve and Latrisha. Latrisha's sister Vickie Burleson and Vickie's daughter Breanna Lackey lived across the road from the Winders.

21.     Steve had a history of depression. During his first marriage, Steve threatened suicide and received treatment for depression. In June of 2021, Steve was believed to be taking Prozac for depression.

### B. Young County Sheriff's Office and Deputy Sheriff Gallardo

22.     Young County's population in 2021 was approximately 18,000. Defendant Travis Babcock is the Young County Sheriff. Being a rural county with a very small population, the Young County Sheriff's Office has a small number of deputy sheriffs.

23.     Defendant Joshua M. Gallardo became employed by the Young County Sheriff's Office as a Deputy Sheriff on November 2, 2020. Before filing this civil action, Plaintiffs' counsel requested that the Young County Sheriff's Office provide Deputy Gallardo's non-confidential employment records and the Young County Sheriff's Office's investigative report of the Winder shooting under the Texas Public Information Act. The Young County Sheriff's Office refused to produce these requested documents.

24.     Before becoming a licensed peace officer, Deputy Gallardo first was a jailer for the Wichita County Sheriff's Office for approximately four and one-half years. The Wichita County Sheriff's Office performance evaluations for Deputy Gallardo reflect that his judgment and decision-making were poor, as was his

knowledge of methods and procedures—they did not meet expectations and improvement was needed.

25.     After attending the Police Academy at Vernon College in 2019-2020 and becoming a licensed Texas peace officer on July 1, 2020, Deputy Gallardo's first job was as a Sheriff's Deputy with the Ochiltree County Sheriff's Office in Perryton, Texas. While on probationary status, and after only approximately three months, Deputy Gallardo was either fired or was asked to resign after an incident involving his poor judgment while on duty guarding a hospitalized jail inmate. Deputy Gallardo's employment history also includes being fired by Wal-Mart.

26.     After separating from the Ochiltree County Sheriff's Office in October 2020, Deputy Gallardo was hired by the Young County Sheriff's Office and started on November 2, 2020.

C. Sunday, June 27, 2021

27.     On Sunday, June 27, 2021, Latrisha was at Fort Lee, Virginia for Advanced Individual Training. Latrisha had recently joined the United States Army National Guard. She had last been home in March of 2021 and had last seen Steve in person on June 3, 2021.

28.     On Sunday afternoon, Steve, family members, and relatives were swimming in the Winders' pool. Steve had also been drinking that afternoon. Steve accidentally got in the pool with his cell phone, so he went inside, found and charged Latrisha's old cell phone and put his SIM card in it, and found Facebook messages between Latrisha and her ex-husband whom she had divorced in 2001. Latrisha's ex-

husband had started sending Facebook messages to Latrisha in 2019 about wanting to get back together with Latrisha, but she declined. Latrisha, however, had not told Steve about these messages.

29.     Around 4:00 PM, Steve came over to Lou Anne's house appearing upset and asked her to look at the messages on Latrisha's old cell phone. Lou Anne reviewed the messages and pointed out to Steve that, while Latrisha should not have been messaging with her ex-husband, her messages did not indicate a desire to get back together with him, and Steve agreed with Lou Anne. Steve then went back to his house.

30.     Concerned, Lou Anne went over to Steve's house to check on him and found him in his bedroom. Steve asked to use Lou Anne's cell phone to call Latrisha, and Lou Anne left the bedroom while Steve and Latrisha talked. After that, Steve asked Lou Anne to take J.W. with her to Lou Anne's house, which Lou Anne did.

31.     Back at her house, Lou Anne started receiving texts from Latrisha about Latrisha's concern for Steve because she could not reach him. Latrisha then called Lou Anne, saying that she was with an Army chaplain and was worried about Steve because of his history of drinking too much and mental illness. Lou Anne went over to Steve's house to check on him again and then returned home. Around 7:00 PM, Lou Anne received a Facetime call from Latrisha with an Army Chaplain, and Latrisha told Lou Anne that Steve had sent her a photo of him with a gun. Steve had taken photos of a handgun under his chin and to his head and had texted them to

Latrisha, stating that he could not bear it anymore. Lou Anne told Latrisha that she would go and check on Steve again.

32.     Lou Anne went to Steve's house and into his bedroom to talk to him. From the outside, Steve's bedroom was to the right of the front door. The below photograph is an interior view of the front door and Steve's bedroom door to the left.



33.     The following post-shooting image from the front porch depicts the open front door, the view from the porch of Steve's bedroom door, and Deputy Gallardo.



34.     Steve was in his chair in the bedroom's corner that was opposite the corner where the bedroom door was. The following photograph depicts the bedroom from the bedroom door.



35.     Lou Anne sat on the bed to talk to Steve and noticed that his handgun was tucked between the bed's sideboard and the mattress. Steve lawfully possessed this gun, having a constitutional right under the Second Amendment to possess a gun in his home. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

36.     Lou Anne and Steve talked again about Latrisha's messaging with her ex-husband, how it was wrong but that everyone makes mistakes, and that Steve could forgive her. They also talked about how Steve knew that Latrisha loved him, and, choking up and crying, Steve talked about how much he loved Latrisha and that she was his "world."

37.     At that point, Lou Anne called her other daughter Vickie. Vickie's daughter Breanna answered, and Lou Anne told her to tell Vickie to go to Lou Anne's house to be with six-year-old J.W. Vickie and Breanna went to Lou Anne's house.

38.     Meanwhile, at Fort Lee, the Army Chaplain had pressured Latrisha, against her wishes, to call local law enforcement ask them to conduct a welfare check on Steve, so Latrisha called the Young County Sheriff's Office. Latrisha asked them to do a welfare check on Steve because he had sent her photos of him with a gun to his head. In her call, Latrisha did not allege or report that Steve had committed or was going to commit a crime; she asked only that they "check on" Steve. In Latrisha's call, she gave the dispatcher Steve's phone number, but his number apparently was not passed on to the officers so that they could contact him by phone before attempting to confront him in person.

39.     Rookie Sheriff's Deputy Joshua Gallardo, who was twenty-three years old, and Sheriff's Deputy Simon Dwyer, an experienced peace officer for seventeen years, were partners that evening and were eating dinner at Taco Casa in Graham. They were dispatched to the Winder home to check on Steve for a possible suicide attempt. The dispatcher noted to the deputies that Steve "does have a gun" and a little later that the reporting party (Latrisha) had said that her husband had sent her a photo of himself holding a gun and had said to her that he could not bear this anymore. Deputy Gallardo had finished his meal and left before Deputy Dwyer, who apparently did not sense an emergency and finished his meal, cleaned off their table, and then left for the Winder residence in response to the call.

40.     In Deputy Gallardo's July 15, 2021 written statement, which was over two weeks after the shooting, he stated:

> At approximately 1955 hours, I was dispatched to a call involving a suicidal male with a gun at a residence, located at 3640 FM 2652. From recollection, *I asked whether the male was currently trying to harm himself and was told that he had a gun and Dispatch said it was unknown if the male was trying to hurt himself. I was told that the Reporting Person was not there so that person didn't know whether he was trying to hurt himself.* I was provided the male's name but only heard his first name of Steve. [Emphasis added.].

41.     Deputy Gallardo and Deputy Dwyer drove separate patrol vehicles to the Winder home, but Deputy Gallardo arrived several minutes before Deputy Dwyer and approached the Winder home without displaying any urgency. After exiting his patrol vehicle, Deputy Gallardo turned on his body cam and casually walked approximately 100 feet to the back of the Winder home and knocked on the back door. Again showing no urgency, Deputy Gallardo waited for approximately thirty seconds, and no one came to the back door. Deputy Gallardo then casually walked to the right between the Winder home and Lou Anne's home, calling out "hello" twice. He then walked toward the front of Lou Anne's home, where he encountered nineteen-year-old Breanna, Steve's niece, at Lou Anne's carport. Deputy Gallardo asked Breanna if Steve was there, and Breanna said that he was but pointed at the Winder home. Deputy Gallardo said that he needed to talk to Steve. Deputy Gallardo did not express any urgency to her or identify an ongoing emergency situation.

42.     Showing no urgency or alarm herself, Breanna first started to walk toward the Winder home with Deputy Gallardo but then turned, said she was going to get her mother, and went back toward Lou Anne's front porch to tell her mother

Vickie that a police officer was there and wanted to talk to Steve. Again showing no urgency, Deputy Gallardo waited on Breanna to return, with approximately forty seconds passing after he first encountered Breanna before Breanna began to walk Deputy Gallardo to the Winder home a second time. As Breanna was returning to Deputy Gallardo, dispatch notified him by radio that the caller's mother "*may* be on the property trying to make contact with the husband."

43.    Meanwhile, Vickie called her mother Lou Anne to tell her that a police officer was there, wanted to talk to Steve, and was on the way over. Lou Anne, who was with Steve in his bedroom with the bedroom door closed, responded that she wished he would not come over because she knew how Steve felt about his privacy and his private property.

44.    After returning to Deputy Gallardo, Breanna casually walked toward the Winder home, displaying no urgency, and Deputy Gallardo followed behind her, likewise displaying no urgency. Vickie had started following Deputy Gallardo and Breanna to the Winder home and asked Deputy Gallardo how he was doing as he was approaching the Winders' front porch, and Deputy Gallardo casually replied, "Good." It took Breanna and Deputy Gallardo thirty-two seconds to walk from Lou Anne's home to the Winders' front door.

45.    Below is an image from Deputy Gallardo's body cam of the Winders' front porch, with the front door on the left, the wall at the end being Steve's bedroom wall, and Breanna motioning Deputy Gallardo up the steps.



46.     When Breanna and Deputy Gallardo got to the porch steps, Breanna stopped, motioned for Deputy Gallardo to go ahead and said, "Go ahead." But Deputy Gallardo, again appearing at ease with the situation and displaying no urgency, casually motioned to Breanna to go ahead and said, "If you wanna just open the door." Breanna approached the front door and, refusing to open the door, knocked instead. A muffled loud voice could be heard inside the house, and Breanna, appearing uncomfortable and pausing to try to hear inside, stepped away from the door. Breanna then told Deputy Gallardo, "They're coming to the door … ." Deputy Gallardo replied, "Okay." Breanna left the porch, and Deputy Gallardo stood on the porch for twenty seconds. None of Deputy Gallardo's and Breanna's conversation or body language indicated any urgency.

47.     While Deputy Gallardo and Breanna were talking outside Lou Anne's home and then walking over to the Winder home, Lou Anne, after being phoned by Vickie and told that the police officer was coming over, told Steve that she wanted to take Steve's gun and put it under the bed because a police officer was coming over.

This made Steve upset, and he responded along the lines of: "I don't give a [expletive]. This is my home."

48.     At that time, Lou Anne said that they could hear someone at the front door even though Steve's bedroom door was closed. Lou Anne got up to go to the front door and told Steve that it was probably the police officer. Steve said to Lou Anne loudly and with an upset tone something like, "what the, this is my home" and grabbed his gun from the side of the bed. Lou Anne walked toward the bedroom door after seeing Steve pick up his gun and get out of his chair.

### D. The Unconstitutional Entry

49.     Instead of waiting for Deputy Dwyer, his experienced partner, to arrive, and instead of attempting to contact the sergeant on duty—if one was even on duty— Deputy Gallardo opened the front door of the Winder home without knocking and stood at the door's threshold. According to Lou Anne, at some point Deputy Gallardo made a small step on or into the threshold.

50.     Deputy Gallardo did not have a warrant to enter the Winder home, and based on everything that had transpired once Deputy Gallardo had arrived at the Winder property, there were no exigent circumstances for Deputy Gallardo to make entry into the Winder home. Also, conducting a welfare check does not justify a warrantless entry of a home under the Fourth Amendment. *Caniglia v. Strom*, 141 S.Ct. 1596, 1599 (May 17, 2021).

### E. The Unconstitutional Shooting

51.      After opening the door, Deputy Gallardo said, "Hello, Sheriff's Office."
Not getting a response, Deputy Gallardo said in a louder voice, "Steve." Steve yelled
out, "What?" and Lou Anne simultaneously opened the bedroom door but was not
visible on Deputy Gallardo's body cam because Deputy Gallardo was positioned
partially behind the right side of the front door frame. Lou Anne calmly said to
Deputy Gallardo, "We're right here. Can I help you?" Deputy Gallardo asked what
was going on, and Steve yelled to him from his bedroom, "Don't worry about it." Lou
Anne calmly said to Deputy Gallardo, "I'm talking to my son-in-law. He's upset right
now but we're … right now," intending to communicate to Deputy Gallardo that they
were all right.

52.      At that point, Steve had gotten up from his chair with his gun and had
begun walking toward the open bedroom door where Lou Anne was standing and
talking to Deputy Gallardo. While looking at Steve after he had gotten up with his
gun and was rounding the far corner of the bed, Lou Anne told him, "Steve, put it up."
This was the last time Lou Anne looked at Steve before he was shot. Steve again said
loudly, "Don't worry about … [inaudible]."

53.      Deputy Gallardo then reached for his gun and Lou Anne stopped looking
at Steve and looked only at Deputy Gallardo as she noticed him reaching for his gun.
Also at that time, the following was heard on Deputy Gallardo's radio: "2318, I'm out."
This was likely Deputy Dwyer announcing that he had arrived at the Winder property
and was out of his patrol vehicle.

54.     Because Deputy Gallardo had reached for his gun and moved to his left, Lou Ann became visible on his body cam. Seeing Deputy Gallardo draw his gun, Lou Anne took a small step outside the bedroom with her eyes on Deputy Gallardo and said to Officer Gallardo while holding her right hand up to him in a gesture to stop, "He's got a gun." Steve was not visible on Deputy Gallardo's body cam. Because Lou Anne saw Deputy Gallardo raise his gun and point it toward her and the bedroom doorway, Lou Anne was watching only Deputy Gallardo at this point and was not watching what Steve was doing beside and a little behind her when he got to the bedroom doorway.

55.     After Lou Anne had said, "He's got a gun," Deputy Gallardo said on his radio, "He's got a gun. He's got a gun." Steve was still not visible on Deputy Gallardo's body cam. Lou Anne then took another small step with her right hand up to Deputy Gallardo, continuing to gesture to him to stop and also obviously pleading to him to stop and back off, but almost all her words are inaudible because Deputy Gallardo was talking at the same time, saying, "Put it down, man," and then yelling, "Put it down."

56.     The following image from Deputy Gallardo's body cam depicts Lou Anne gesturing and pleading with Deputy Gallardo to stop and back off.



57.     After yelling "put it down" the second time, Deputy Gallardo fired one shot at Steve with his Glock 17 nine mm pistol while Steve was standing in the bedroom doorway next to and slightly behind Lou Anne but still not visible on Deputy Gallardo's body cam. Steve screamed out in pain, and Lou Anne screamed, "Oh, Dear God." Within four minutes of his arrival on the Winder property, Deputy Gallardo fatally shot Steve in his own home.

F.  Deputy Dwyer Arrives

58.     Deputy Dwyer arrived on the Winder front porch approximately forty seconds after Deputy Gallardo shot Steve. After entering Steve's bedroom and examining the scene and Steve, who was on the floor at the foot of the bed, Deputy Dwyer pointed at a gun on the far back corner of the bed opposite to where Steve was standing when he was shot and asked Deputy Gallardo if that was "the gun." Deputy Gallardo responded affirmatively.

59.     Deputy Dwyer then left Deputy Gallardo in the bedroom with Steve to secure the rest of the house, closing the bedroom door behind him. Deputy Dwyer began talking with Lou Anne and then Vickie, saying to her, "I'm sorry I couldn't get here any quicker." Lou Anne approached Deputy Dwyer with Latrisha on her cellphone on Facetime, and Deputy Dwyer told Latrisha, "I apologize I couldn't have got here any quicker than I did."

60.     Deputy Dwyer then returned to Steve's bedroom to assist Deputy Gallardo with Steve and instructed Deputy Gallardo to secure Steve's gun. Deputy Gallardo picked up Steve's gun with his bare hands, removed the magazine and checked for a bullet in the chamber, and then set the gun and the magazine on the chair. Deputy Gallardo then picked up Steve's gun and the magazine again with his bare hands and left the house and put them in his patrol vehicle.

## IV.    CAUSES OF ACTION

61.     Plaintiffs assert the following causes of action under Section 1983 and the ADA.

> Section 1983 of Title 42 of the United Stated Code provides, in relevant part: Every person who, under color of [law] ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights ... secured by the Constitution ..., shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

42 U.S.C. § 1983.

62.     Section 1983 provides a cause of action to an individual harmed by a state official's violation of federal law. *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019).

63.     A state official sued under Section 1983 is entitled to qualified immunity from damages, which protects the official from liability for any act that was not objectively unreasonable at the time of the act. *Waller*, 922 F.3d at 599. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). This case includes both plainly incompetent police conduct and knowing violations of the law.

64.     A plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Waller*, 922 F.3d at 599.

## COUNT 1
## SECTION 1983 CLAIM FOR WARRANTLESS ENTRY

65.     Plaintiffs incorporate by reference the above allegations.

66.     The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.

67.     "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Jardines*, 569 U.S. at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Supreme Court Fourth Amendment cases therefore "have firmly established the 'basic principle of Fourth Amendment law that searches ... inside a home without a warrant are presumptively unreasonable.' " *Groh*

*v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

68.     The Supreme Court has repeatedly said that " 'physical entry of the home is the chief evil against which [the Fourth Amendment] is directed,' " *Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (quoting *Payton*, 445 U.S. at 585), and that the Fourth Amendment draws a "bright" and " 'firm line at the entrance to the house.' " *Kyllo v. United States*, 533 U.S. 27, 40 (2001) (quoting *Payton*, 445 U.S. at 590).

69.     The Supreme Court has "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch' was too much." *Id.* (quoting *Silverman*, 365 U.S. at 512). "[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Id.* "*Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance." *E.R. v. Jasso*, 573 F. Supp. 3d 1117, 1134 (W.D. Tex. 2021), *aff'd,* No. 22-50017, 2022 WL 4103621 (5th Cir. Sept. 8, 2022) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991)).

70.     Steve's Fourth Amendment right to be free from a warrantless entry into his home was clearly established law. In opening Steve's front door and making entry into Steve's home, Deputy Gallardo violated Steve's Fourth Amendment right by his warrantless entry into Steve's home.

71.     An exception to the Fourth Amendment's warrant requirement for community caretaking (e.g., a welfare check) did not exist on June 27, 2021. On May 17, 2021, the United States Supreme Court held that community caretaking is not an exception to the Fourth Amendment's warrant requirement for entry into a residence. *Caniglia v. Strom*, 141 S.Ct. 1596, 1599 (May 17, 2021).

72.     Exigent circumstances were not present to justify Deputy Gallardo's warrantless entry. Officers may enter a home without a warrant "where exigent circumstances," such as "the need to assist persons who are seriously injured or threatened with such injury," justify the entry. *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 400, 403 (2006)). This emergency-aid exception "does not depend on the officers' subjective intent;" rather, it requires "an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). The Fifth Circuit has "declined to apply the emergency[-]aid exception absent strong evidence of an emergency at the scene or an imminent need for medical attention." *Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018). But the existence of an emergency does not end the inquiry, for "[i]n addition to determining whether there was an objectively reasonable basis for identifying an emergency, courts must decide whether the officer who engaged in conduct without a warrant acted reasonably." *Toussaint*, 838 F.3d at 509.

73.    It is evident from Deputy Gallardo's statement and conduct that there was not an objectively reasonable basis for Deputy Gallardo to identify an emergency, and he did not act reasonably in opening the front door of the Winder home.

74.    Deputy Gallardo stated that Dispatch told him that "it was unknown if the male was trying to hurt himself" and "that the Reporting Person was not there so that person didn't know whether he was trying to hurt himself." Therefore, the dispatch call did not give Deputy Gallardo an objectively reasonable basis to identify an emergency. And when Deputy Gallardo arrived at the Winder property, he did not display any urgency that would objectively permit a reasonable inference that he believed an emergency was ongoing. After exiting his patrol vehicle, he casually walked first to the Winder home and then to Lou Anne's home. When he encountered Breanna at Lou Anne's home, he did not express any urgency to her. And when he walked behind Breanna to the Winder home with Vickie behind him, he casually walked and engaged in small talk with Vickie.

75.    Furthermore, Breanna's and Vickie's conduct when Deputy Gallardo encountered them negated an objectively reasonable basis for him to identify an emergency. They both were close relatives of Steve who lived just across the road from him, both were next door at Lou Anne's home, and both were generally aware of what was going on with Steve that evening. In their interactions with Deputy Gallardo, neither of them expressed any concern to Deputy Gallardo or displayed a sense that an emergency was occurring. To the contrary, they were both calm and ordinary.

76.     Finally, when Deputy Gallardo and Breanna were on the Winders' front porch and Breanna, a close relative and neighbor, refused to open the front door at Deputy Gallardo's request, she demonstrated to Deputy Gallardo that it was objectively unreasonable for him to open the door. Exigent circumstances were not present to justify Deputy Gallardo's warrantless entry. *See, e.g., Estate of Vargas v. Cty. of Hudson*, No. 14-1048, 2020 WL 3481774 (D. N.J. June 26, 2020) (denying summary judgment in case of warrantless entry and officer shooting of mentally ill man in his home because fact issues existed on exigent circumstances); *Fairclough v. Joyce*, No. CIV. 11-6222 FSH, 2015 WL 733388, at *1 n.3 (D.N.J. Feb. 20, 2015) (denying summary judgment in case of warrantless entry and arrest of armed, intoxicated, and suicidal man in his home because fact issues existed on exigent circumstances).

77.     Because Deputy Gallardo violated Steve's Fourth Amendment right with his unjustified warrantless entry and because that right was clearly established as of June 27, 2021, Deputy Gallardo is not entitled to qualified immunity.

78.     Deputy Gallardo's warrantless entry into the Winder home in violation of the Fourth Amendment was a proximate cause of his fatally shooting Steve and of Plaintiffs' injuries and damages. But for Deputy Gallardo's warrantless entry into the Winder home in violation of the Fourth Amendment, he would not have fatally shot Steve. Deputy Gallardo's warrantless entry in violation of the Fourth Amendment was a substantial factor in bringing about Steve's death and was a cause-in-fact of

Steve's death and of Plaintiffs' injuries and damages. *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1074-1076 (9th Cir. 2018), *cert. denied*, 139 S.Ct. 1292 (2019).

79.     It was reasonably foreseeable that Deputy Gallardo's warrantless entry would lead to his fatally shooting Steve and to Plaintiffs' injuries and damages.

> [A]s a general matter, the risk of injury posed by the entry of an armed stranger into a residence is one of the reasons the Fourth Amendment prohibits entry except under defined specific conditions. There is historical evidence suggesting that the point of the Fourth Amendment's prohibition against trespass into homes was in part to prevent damage done by the trespassers.
> ….
>
> [U]nlawful entry invites violence.
> ….
>
> Important social interests are served by minimizing interactions between armed police officers on high alert and innocent persons in their homes, precisely because such interactions can foreseeably lead to tragic incidents where innocent people are injured or killed due to a split-second misunderstanding. One way the Constitution serves these interests is by adopting a rule that restricts officer entry into a residence except in certain limited circumstances. And it is obviously foreseeable that fewer tragic incidents … would occur under an enforced regime where officers will not enter homes without sufficient justification, as compared to one where officers enter without adequate justification. Especially where officers are armed and on alert, violent confrontations *are* foreseeable consequences of unlawful entries.

*Id.* at 1077-1078.

## COUNT 2
## SECTION 1983 CLAIM FOR UNCONSTITUTIONAL SEIZURE AND EXCESSIVE FORCE

80.     Plaintiffs incorporate by reference the above allegations.

81.     The Fourth Amendment prohibits unreasonable seizures. U.S. CONST. amend. IV. A police officer's shooting a person is a seizure under the Fourth Amendment. *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021). Deadly force violates the

Fourth Amendment unless "the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Shooting an unarmed, non-threatening person violates the Fourth Amendment. *See, e.g., id.* at 10–11; *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018).

82.     To establish an excessive-force claim, a plaintiff must show that (1) he was seized, and (2) he suffered an injury (3) resulting directly and only from a use of force that was both excessive to the need and (4) objectively unreasonable. *Carroll v. Ellington*, 800 F.3d 154, 173 (5th Cir. 2015). Fourth Amendment excessive-force claims are analyzed under a reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).

83.     The "reasonableness" inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "[T]he reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury. This is not only because the jury must resolve disputed fact issues but also because the use of juries in such cases strengthens our understanding of Fourth Amendment reasonableness." *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).

84.     The standard and factors for determining whether the use of force is objectively unreasonable are well established: it is a fact-sensitive inquiry that turns on the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In cases where the person is *not* being placed under arrest, the only applicable factor is whether the person " 'posed an immediate threat to the safety of the officers or others.' " *Harris v. Serpas,* 745 F.3d 767, 772 (5th Cir. 2014) (quoting *Graham,* 490 U.S. at 396); *see Robertson v. City of Bastrop*, No. A-14-CV-0839-SS, 2015 WL 6686473, at *5 (W.D. Tex. Oct. 29, 2015). In this case, Deputy Gallardo asserted in his written statement that he was going to take Steve into custody; therefore, the exception in *Harris* is inapplicable.

85.     Additional considerations that "may bear on the reasonableness or unreasonableness of the force used [include]: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

86.     In deadly force cases, the Fifth Circuit has narrowed the excessive force inquiry to "whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir.

2001). Therefore, courts "need not look at any other moment in time." *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011).[1]

87.    After Deputy Gallardo's unconstitutional entry into the Winder home, he shot Steve in the upper right chest. The bullet's path was "in a front-to-back

---

[1] Plaintiffs contend that the Fifth Circuit's narrow approach conflicts with the Supreme Court's totality-of-the-circumstances standard for the reasonableness of force in *Graham*. In *Cty. of Los Angeles, Cal. v. Mendez*, 581 U.S. 420 (2017), the Court plainly stated: "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.' " *Id.* at 427-28 (quoting *Garner*, 471 U.S. at 8–9). "*Graham* commands that an officer's use of force be assessed for reasonableness under the 'totality of the circumstances.' " *Id.* at 428, n.* (quoting *Graham*, 490 U.S. at 396). The Supreme Court recently confirmed that, "[i]n assessing a claim of excessive force, courts ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Lombardo v. City of St. Louis, Mo.*, 141 S. Ct. 2239, 2241 (2021) (internal quotations omitted) (quoting *Graham*, 490 U.S. at 397). "[T]he inquiry 'requires careful attention to the facts and circumstances of each particular case.' " *Id.* (quoting *Graham*, 490 U.S. at 396).

Although the Supreme Court invalidated the Ninth Circuit's provocation doctrine in *Mendez*, 581 U.S. at 428-31, it intentionally did not address whether the totality of the circumstances includes "taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Id.* Therefore, the Supreme Court has not passed on the Fifth Circuit's narrow approach. The Fifth Circuit appears to have sidestepped deciding whether its narrow approach is incompatible with Supreme Court case law on the totality of circumstances. *See Hale v. City of Biloxi, Miss.*, 731 F. App'x 259, 263–64 (5th Cir. 2018) (on plaintiff's contention that court "must look to the totality of circumstances and not just at his decision to put his hands in his pocket," which is when officer then shot him, holding that plaintiff's claim would also fail under the totality-of-the-circumstances standard).

Additionally, it has been noted that the Fifth Circuit's narrow approach conflicts with the law in other circuits. *See Barnes v. Felix*, 532 F. Supp. 3d 463, 468–69 (S.D. Tex. 2021), *dism'd*, 2021 WL 4722005 (5th Cir. July 20, 2021) ("To be sure, this [narrow] approach is not uniform among the circuit courts of appeals. The Seventh, Six, and Tenth Circuits have adopted a more nuanced framework when the officer's own conduct exacerbates the excessiveness of the deadly force used.") (citing *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("If a fleeing felon is converted to a 'threatening' fleeing felon solely based on the actions of a police officer, the police should not increase the degree of intrusiveness.); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) ("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive."); *Fogarty v. Gallegos*, 523 F.3d 1147, 1159–60 (10th Cir. 2008) ("We also consider whether an officer's own 'reckless or deliberate conduct' in connection with the arrest contributed to the need to use the force employed.")).

---

direction, medially and downwards." The bullet perforated Steve's heart and the lower lobe of his right lung. The bullet entered Steve's chest cavity through the third right anterior intercostal space and exited the chest cavity through the seventh right posterior intercostal space, lodging in the soft tissues of the right mid-back. The below image from Steve's autopsy report shows the bullet's entry wound in Steve's upper right chest:



88.     After Deputy Gallardo shot Steve, Lou Anne glanced at Steve and saw him turn around and go down to the bedroom floor on his hands and knees facing the nightstand to the left of the bed. Lou Anne did not see Steve's gun near him. In his statement, Deputy Gallardo stated that, after firing one shot at Steve, "Steve fell backwards onto the floor into the bedroom, out of my sight."

89.     Very distraught and upset with Deputy Gallardo after he shot Steve, Lou Anne argued with him that he was out of control and looked at Steve again in the bedroom. She then turned around and yelled to E.W., who was in her bedroom, that her dad had been shot. Lou Anne then stepped toward Steve's bedroom to check on him, but Deputy Gallardo, now pointing his gun at her, ordered her to get back.

Lou Anne backed away and, pointing to the bedroom, said, "He does not have a gun in his hand." After the shooting, Lou Anne did not see Steve holding the gun, moving toward the bed with the gun, or tossing the gun on the bed.

90.    Lou Anne never saw Steve point his gun at Deputy Gallardo, but she initially believed that Steve was holding his gun in the bedroom doorway. Unlike Deputy Gallardo, Lou Anne did not get to consult with a lawyer and view the body cam video footage before being questioned about the shooting.

91.    Lou Anne initially believed that Steve was holding his gun in the bedroom doorway because she had looked at him while he was walking from his chair toward the doorway with it, she did not see him put it down, and he was holding the gun the last time she saw him before he was shot, which was as he was rounding the far corner of the bed when she said to him, "Steve, put it up." She also heard Deputy Gallardo twice say, "He's got a gun." Therefore, Lou Anne assumed that Steve was holding his gun when he stood in the bedroom doorway. But based on information that she later learned from carefully reviewing Deputy Gallardo's and Deputy Dwyer's body cam videos—specifically, the location of Steve's gun after the shooting—and realizing that, after saying, "Steve, put it up," her focus was solely on Deputy Gallardo, Lou Anne believes that Steve put his gun on the bed when she told him to "put it up" and that he was neither holding the gun in the bedroom doorway nor pointing it at Deputy Gallardo when he was shot.

92.    Steve's bedroom's dimensions are approximately fifteen feet by fourteen feet, and the interior width of the bedroom door frame is approximately twenty-nine

and one-half inches. The diagonal length of the bedroom's opposite corners is approximately twenty and one-half feet. The bed's mattress is king size, measuring approximately seventy-six inches by eighty inches.

93.     The following two post-shooting images from Deputy Dwyer's body cam show where Steve's gun, a Para 45-caliber pistol, was located once the officers entered his bedroom and until Deputy Gallardo picked it up to unload it and then take it outside.





94.     In these images, Steve's gun is lined up just next to two cell phones on the bed and next to his chair. The gun appears as if it had been carefully set down

next to the two cell phones. A third cell phone is on a notebook much closer to the foot of the bed.

95.     The below image depicts all three cell phones. Those three cell phones are believed to be Lou Anne's phone, Steve's phone that he had dropped in the pool, and Latrisha's old phone that Steve had started using that afternoon. The gun is apparent in this image. Steve's gun, a Para 1911 45-caliber pistol, weighs over three pounds fully loaded.



96.     The following lay floor plan (with the inserted furniture not being to scale) depicts Steve's location when he was shot and the gun's location after the shooting, as shown by the officers' body cams.



97.    When Steve was shot, he was approximately thirteen feet from where his gun was located after the shooting. According to both Lou Anne and Deputy Gallardo, after being shot, Steve went down to the floor. *If* Steve was holding his gun or pointing his gun at Deputy Gallardo when Deputy Gallardo shot Steve—a fact that Plaintiffs dispute—there is the critical question of how Steve's gun got on the bed thirteen feet away and lined up next to the cell phones.

98.    If Steve was holding his gun when he was shot, there appears to be three possibilities for how his gun got on the bed approximately thirteen feet away from him. First, admittedly it is possible that he could have flung it onto the bed right after he was shot and as he was going down onto the floor. This possibility is highly improbable. Because Steve had just been shot through the heart and lung and was very intoxicated (with a blood-alcohol level of 0.173, just over twice the legal limit), it

is almost unimaginable that Steve would have had the mental and physical ability or wherewithal to throw his gun approximately thirteen feet onto the bed and have it land perfectly next to the lined-up cell phones as if it had been carefully placed next to them. And the fact that Lou Anne did not see Steve throw his gun after being shot makes this possibility even more improbable.

99.    The second possibility—that, after going to the floor, Steve got up on his knees or feet and tossed his gun onto the bed from a similar distance of approximately eight to ten feet—is also highly improbable for the same reasons as the first possibility.

100.    The third possibility is that, after going to the floor with his gun, Steve stood up with his gun, walked around the bed to the opposite corner of the bedroom holding his gun, and sat his gun on the bed next to the two cell phones in an apparently careful manner. Again, after Steve was shot, Lou Anne did not see Steve get up or holding his gun. And given Steve's severe injuries and intoxication, it is extremely improbable that he would have had the mental and physical ability or wherewithal to get on his feet and walk around the bed to carefully place the gun on the bed lined up next to the cell phones. Also, if Steve had done that, he likely would have either then sat in his chair or gone back down to the floor on that side of the bed, but he did neither.

101.    The Texas Rangers of the Texas Department of Public Safety investigated Deputy Gallardo's shooting and killing Steve. Jacob Weaver, a Texas Ranger investigator out of Wichita Falls, met with and investigated Deputy Gallardo

at the Olney hospital, where Deputy Gallardo was suspiciously taken by ambulance after the shooting. Deputy Gallardo refused to talk to Ranger Weaver about the shooting without his lawyer present. Eighteen days later, Deputy Gallardo provided Ranger Weaver with Deputy Gallardo's written statement, which was obviously drafted by a lawyer and not by a rookie twenty-three-year-old sheriff's deputy.

102.    Ranger Weaver's investigative report did not determine whether Deputy Gallardo's shooting and killing Steve was justified, nor did it determine whether Steve was holding a gun or pointing a gun at Deputy Gallardo when Steve was shot. The Texas Rangers' analysis of enhanced video from Deputy Gallardo's body cam alleges that an apparent black object was allegedly being held by Steve, but the "object was not clearly visible to enable positive identification" of it.

103.    Furthermore, Steve's gun has been forensically tested by an expert forensic scientist for the presence of blood, and there is no blood on the gun. If Steve had been holding the gun when and after he was shot, including when he somehow would have been placing it on the bed after being shot in the heart, it is highly likely that his blood would be on the gun. The fact that there is no blood on Steve's gun makes it even more improbable that he was holding the gun when he was shot.

104.    Based on Steve's location when he was shot, Lou Anne's observations of Steve after he was shot, the location of his gun after he was shot, and the fact that there is no blood on the gun, it is implausible that Steve was holding his gun when Deputy Gallardo shot him. What is plausible and likely is that Steve put his gun down on the bed when Lou Anne told him to "put it up" and that Deputy Gallardo, who was

an inexperienced twenty-three-year-old rookie sheriff's deputy with poor judgment in his law-enforcement work history and who had been told by Dispatch and then by Lou Anne that Steve had a gun, was unreasonably and fatally mistaken in thinking that Steve was holding a gun and pointing it at him when he shot Steve. *See Waller*, 922 F.3d at 599 (holding plaintiffs plausibly alleged victim was unarmed and denying motion for judgment on the pleadings on qualified immunity).

105.   Plaintiffs therefore contend that Steve was unarmed when Deputy Gallardo shot him and that Deputy Gallardo's actions were objectively unreasonable.[2] Shooting an unarmed, non-threatening person violates the Fourth Amendment. *Garner*, 471 U.S. at 10–11; *Darden*, 880 F.3d at 731. Deputy Gallardo violated Steve's Fourth Amendment right by using excessive force, and this violation of Steve's Fourth Amendment right caused Steve's death and Plaintiffs' injuries and damages.

## COUNT 3
## SECTION 1983 SUPERVISORY LIABILITY

106.   Plaintiffs incorporate by reference the above allegations.

107.   Defendant Travis Babcock received his basic peace officer's license in November 2012 and his intermediate peace officer's certificate in November 2014. He became the Young County Sheriff on October 31, 2016.

108.   In Texas, a county sheriff is the elected and top law enforcement officer in the county. With that power and authority comes great responsibility.

---

[2] Alternatively, a fact issue exists on the reasonableness of Deputy Gallardo's actions, and therefore qualified immunity is not available. *See Cole v. Carson*, 935 F.3d 444, 455–56 (5th Cir. 2019) (en banc) ("[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street," the caselaw "will not permit summary judgment in favor of the defendant official. ... [A] trial must be had.").

It has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected:

Because of the unique structure of county government in Texas ... elected county officials, such as the sheriff ... hold[ ] virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein ... .

*Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (quoting *Monell,* 436 U.S. at 694).

*Turner v. Upton Cty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) (internal citations altered).

109.   Sheriff Babcock utterly failed in his responsibilities for training and supervising rookie Deputy Gallardo.[3] No supervisor was on duty to direct Deputy Gallardo on his way to the Winder property or to direct him at the scene—Latrisha's call to the Young County Sheriff's Office does not reflect the involvement of a supervisory officer such as a sergeant or Sheriff Babcock, and Deputy Gallardo's body cam audio reflects no communications with a supervisory officer. The absence of a supervisor on duty to direct Deputy Gallardo while on his way to a call for an armed, emotionally disturbed, mentally ill, and suicidal man in his home and then to direct Deputy Gallardo at the scene, and Deputy Gallardo's conduct at the scene, evidence or give rise to a plausible inference of Sheriff Babcock's deliberate indifference to the obvious risk of harm in a law-enforcement confrontation with an armed, emotionally

---

[3] As mentioned, the Young County Sheriff's Office refused to provide Plaintiffs' counsel with its policies, procedures, practices, and training records pertaining to approaching and conducting a welfare check on an armed, emotionally disturbed, or mentally ill suicidal person in his own residence.

disturbed, mentally ill, and suicidal man in his home. Sheriff Babcock's deliberate indifference is even more pronounced given Young County's small population and his small deputy force, which allowed Sheriff Babcock a greater opportunity to adequately train and properly supervise a rookie deputy. *See Brown v. Bryan Cty., Okla.,* 219 F.3d 450, 458 (5th Cir. 2000) (noting "fact that the sheriff's department had relatively few officers [made] it highly unlikely that [new, inexperienced reserve deputy sheriff] was 'lost in the crowd' "). Also, Sheriff Babcock knew or should have known from Deputy Gallardo's prior work history as a Wichita County jailer and briefly as an Ochiltree County Sheriff's Deputy that Deputy Gallardo had a law-enforcement history of poor judgment and therefore needed supervision. And the fact that Deputy Dwyer apologized to Lou Anne and then to Latrisha for his not getting to the scene sooner—that is, before Deputy Gallardo confronted and then shot Steve—further evidences Sheriff Babcock's deliberate indifference to having Deputy Gallardo adequately trained and properly supervised.

110.    Law enforcement has long known that non-confrontation, de-escalation, communication, and patience are key principles in responding to a person in a serious mental health crisis such as an armed suicidal person. A magazine article in March 2000 in *Police Magazine* states:

> The essential difference between suspect encounter training that officers traditionally receive, and how to approach the mentally ill, is the need to be non-confrontational. Such a requirement to, in effect, shift gears is diametrically opposed to the way officers are routinely expected to control conflict. The same command techniques that are employed to take a criminal suspect into custody can only serve to escalate a conflict with the mentally ill into violence.

111.    In its January 17, 2017 policy statement "The National Consensus Policy on Use of Force," the International Association of Chiefs of Police requires that deadly force "not be used against persons whose actions are a threat only to themselves" and that an officer should "use de-escalation techniques and other alternatives to higher levels of force."

112.    The National Law Enforcement Policy Center recommends that officers "first take time, if possible, to survey the situation in order to gather necessary information and avoid hasty and potentially counterproductive decisions and actions." Also, officers "should avoid approaching the subject until a degree of rapport has been developed." Similarly, the Police Executive Research Forum advises that officers "not rush the person or crowd his personal space. Any attempt to force an issue may quickly backfire in the form of violence." "What works best and what is most beneficial is patience and communication."

113.    The Treatment Advocacy Center is a national nonprofit organization dedicated to eliminating barriers to the timely and effective treatment of severe mental illness, and it promotes laws, policies, and practices for the delivery of psychiatric care to, among other things, reduce the number of fatal encounters between police and the mentally ill. According to its December 2015 report "Overlooked and Undercounted, the Role of Mental Illness in Fatal Law Enforcement Encounters," a minimum of one in four of all fatal police encounters involves the death of a person with severe mental illness. At this rate, the risk of being killed

during a police encounter is sixteen times greater for persons with untreated mental illness than for members of the general population.

114.    Also, courts have recognized the dangers of an officer's warrantless or uninvited entry into a home:

> [E]ven if an officer knocks and announces his or her presence, or seeks consent to enter, a homeowner may reasonably still wish that the officer not enter, especially in circumstances like this, where the officer has a weapon drawn and is on alert. The reason why is obvious. An innocent homeowner reasonably may believe that allowing an agitated officer to enter the residence will substantially increase the risk that a person, pet, or property inside might be harmed. Police officers rightly remind the public that they are required to make split-second decisions in very difficult situations. *See Tennessee v. Garner*, 471 U.S. 1, 19, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). These split-second decisions cannot in every case be made reliably so as to avoid harm to innocents. But these imperfect life-or-death decisions demonstrate that entry by an officer, on alert, with weapon drawn, can foreseeably result in shooting injuries where the officer mistakes an innocent implement for a weapon. Entry poses a foreseeable and severe risk only partly mitigated by knocking and announcing. Under circumstances like those presented here, the safe course for the public and the one prescribed by the Fourth Amendment, is for officers to remain outside, unless or until they have a warrant or consent or exigent circumstances arise.

*Mendez*, 897 F.3d at 1079.

115.    As of June 27, 2021, Sheriff Babcock had been Young County Sheriff for four years and eight months and had been a licensed peace officer for over ten and one-half years. In October 2019, he attended a seventeen-hour conference for training coordinators, and by June of 2021, he would have had his own substantial training and experience with crisis intervention. From his own training and experience, and from his own training on training coordination, Sheriff Babcock was aware of the above principles for responding to a person in a serious mental health crisis such as

an armed suicidal person, was aware of the need to train and supervise young, inexperienced officers on these principles, and was aware of the obvious risk of harm in a law-enforcement confrontation with an armed, emotionally disturbed, mentally ill, and suicidal person in his home. The obvious risk of harm is that the law-enforcement officer will shoot the armed suicidal person mistakenly, in alleged self-defense, or as a "suicide by cop," and all these scenarios are avoidable with proper supervision and adequate training.

116.   Sheriff Babcock was responsible for adequately staffing the Young County Sheriff's Office with supervisory officers to supervise and direct deputies in the field and for adequately training inexperienced, rookie officers like Deputy Gallardo. The absence of a supervisor on duty to direct rookie Deputy Gallardo and Deputy Gallardo's conduct at the scene evidence or give rise to a plausible inference of Sheriff Babcock's conscious decision to disregard the obvious risk of harm in a law-enforcement confrontation with an armed, emotionally disturbed, mentally ill, and suicidal man in his home like or similar to Deputy Gallardo's fatal confrontation with Steve Winder on June 27, 2021.

117.   Sheriff Babcock was deliberately indifferent to the obvious risk of harm to Steve that was created by his failure to provide for supervision of Deputy Gallardo and his failure to adequately train Deputy Gallardo for a call involving an armed, emotionally disturbed, mentally ill, and suicidal man in his home like or similar to Deputy Gallardo's confrontation with Steve, and Sheriff Babcock's deliberate indifference was a direct cause of Deputy Gallardo's fatally shooting Steve. Deputy

Gallardo fatally shot Steve within four minutes of arriving at the Winder property. Indeed, when Deputy Dwyer arrived at the scene and quickly learned what had happened, he apologized to Lou Anne and then to Latrisha for not getting to the scene before Deputy Gallardo confronted and shot Steve because Deputy Dwyer immediately recognized Deputy Gallardo's egregious errors in his confrontation with Steve. These egregious errors were caused by Sheriff Babcock's deliberate indifference to the obvious risk of harm to Steve that was created by Sheriff Babcock's failure to provide for supervision of Deputy Gallardo while he was on a call for an armed, emotionally disturbed, mentally ill, and suicidal man in his home and his failure to adequately train Deputy Gallardo for such a call. Therefore, a sufficient causal connection exists between Sheriff Babcock's deliberate indifference and Steve's shooting death.

## COUNT 4
## SECTION 1983 *MONELL* LIABILITY

118.    Plaintiffs incorporate by reference the above allegations.

119.    The Young County Sheriff's Office is a servient political agency of Young County. *See Hicks v. Tarrant Cty. Sheriff's Dep't*, 352 Fed. Appx. 876, 878 (5th Cir. 2009). Sheriff Babcock is Young County's final policymaker in the area of law enforcement. *See Brown,* 219 F.3d at 453; *Turner*, 915 F.2d at 136.

> Because of the unique structure of county government in Texas ... elected county officials, such as the sheriff ... hold[ ] virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein ... . Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must

necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983.

*Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (quoting *Monell,* 436 U.S. at 694).

*Turner*, 915 F.2d at 136 (internal citations altered).

120.    A local government such as a county may be liable under Section 1983 if it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "The [local] government as an entity is responsible under [Section] 1983" "when execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. ..." *Monell*, 436 U.S. at 694.

121.    A county can therefore be liable under Section 1983 for a county's policy or custom that caused an injury. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). The failure to train officers can be a custom or policy that gives rise to Section 1983 liability. *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989)). The failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009). No training and no supervision constitute inadequate training policies and deliberate indifference to the safety of citizens. *Brown,* 219 F.3d at 462. Therefore, Section 1983 liability may be predicated

on a local government's failure to adequately train its law-enforcement officers. *Harris*, 489 U.S. at 387.

122.   A plaintiff must demonstrate that (1) the local government's "training policy procedures were inadequate, (2) [the government] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused" the plaintiff's injury. *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). A plaintiff may allege deliberate indifference based on a single incident but "must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.*

123.   A plaintiff proves that deliberate indifference caused the injury by showing that the highly predictable consequence would have been avoided had the responding officer been properly supervised or adequately trained and by comparing what actually occurred in the plaintiff's case with how a hypothetical well-trained officer would have acted. *Harris*, 489 U.S. at 392. A "high degree of predictability may also support an inference of causation—that the [county's] indifference led directly to the very consequence that was so predictable." *Brown*, 520 U.S. at 409-10.

124.   Young County, through the Young County Sheriff's Office, lacked a policy for supervision of twenty-three-year-old Deputy Gallardo, an inexperienced, novice deputy sheriff responding to a call involving an armed, emotionally disturbed, mentally ill, and suicidal man in his home—Steve Winder. Also, Sheriff Babcock knew or should have known from Deputy Gallardo's prior work history as a Wichita

County jailer and briefly as an Ochiltree County Sheriff's Deputy that Deputy Gallardo had a law-enforcement history of poor judgment and therefore needed supervision. No supervisor was on duty to direct Deputy Gallardo on his way to the Winder property or to direct him at the scene—Latrisha's call to the Young County Sheriff's Office does not reflect the involvement of a supervisory officer such as a sergeant or Sheriff Babcock, and Deputy Gallardo's body cam audio reflects no communications with a supervisory officer. *See, e.g., Brown*, 219 F.3d at 465 (observing there was no supervisory communication or coordination with inexperienced reserve deputy sheriff during entire incident because of county policy of no supervision); *cf. Waller v. City of Danville, Va.*, 556 F.3d 171, 172-73 (4th Cir. 2009) (in responding to call to home of man with known mental-illness history possibly having a weapon and preventing live-in girlfriend from coming to door to confirm her safety to three responding officers, they contacted supervisor, who came to scene, supervisor returned to headquarters to confer with shift commander and then his direct superior, who referred supervisor to call hostage negotiator).

125.    Almost everything that unsupervised Deputy Gallardo did at the scene was contrary to well-established practices and principles for such a call, as described in Count 3. *See, e.g., Brown*, 219 F.3d at 463-64 (discussing evidence regarding how much of inexperienced reserve deputy sheriff's conduct "was contrary to professional standards" and that officer "violated basic standard of police conduct"). It should have been obvious to Sheriff Babcock—and he must have been aware—that the highly predictable consequence of not having a policy for the supervision of Deputy Gallardo

during his response to a call involving an armed, emotionally disturbed, mentally ill, and suicidal man in his home was that it would likely lead to a violation of Fourth Amendment rights such as Deputy Gallardo's warrantless entry into the Winder home and his fatally shooting Steve, which were avoidable with proper supervision.

126.    Deputy Dwyer's apologies to Lou Anne and then to Latrisha for not getting to the scene before Deputy Gallardo confronted and shot Steve also evidence the highly predictable consequence of not having a policy for the supervision of Deputy Gallardo. Deputy Dwyer immediately recognized that unsupervised Deputy Gallardo's egregious errors in his confrontation with Steve directly led to Steve's shooting death.

127.    Therefore, not having a policy for the supervision of Deputy Gallardo constitutes deliberate indifference to Steve's Fourth Amendment rights, and this deliberate indifference was the "moving force" that directly caused Plaintiffs' injuries. *See, e.g., Brown*, 219 F.3d at 462-65 (holding that county's no-supervision policy for inexperienced, rookie reserve deputy sheriff constituted deliberate indifference and was cause of plaintiff's injuries).

128.    Additionally, Young County, through the Young County Sheriff's Office, lacked adequate training policies for its novice sheriff's deputy, twenty-three-year-old Sheriff's Deputy Gallardo. Sheriff Babcock knew or should have known from Deputy Gallardo's prior law-enforcement work history that Deputy Gallardo had a history of poor judgment and that the Young County Sheriff's Office therefore needed adequate training policies for Deputy Gallardo. Specifically, the Young County

Sheriff's Office had no policies or had inadequate policies for rookie Sheriff's Deputy Gallardo for:

- Responding to an armed emotionally disturbed, mentally ill, and suicidal person in his home, including crisis intervention techniques of communication with the person, non-confrontation, de-escalation, having back-up present, and avoidance of unreasonably creating situations where resort to deadly force is necessary.

- Warrantless or uninvited entry into the home of an armed, emotionally disturbed, mentally ill, and suicidal person.

129.   Steve had a history of mental illness and a previous suicide attempt, he was emotionally disturbed over the situation with Latrisha, he was armed, and he was very intoxicated, a fact that Deputy would have learned if he had communicated with Steve, Latrisha, or Lou Anne by phone before encountering Steve. Creating a recipe for the fatal tragedy that unfolded, within four minutes of his arrival on the Winder property and without waiting for Deputy Dwyer to arrive, Deputy Gallardo recklessly entered Steve's home without a warrant or invitation to enter, confronted Steve, and fatally shot him.

130.   Deputy Gallardo's conduct at the scene evidences or gives rise to a plausible inference that the Young County Sheriff's Office training policies for twenty-three-year-old rookie Sheriff's Deputy Gallardo to handle a call to the home of an armed, emotionally disturbed, mentally ill, and suicidal man like Steve Winder were either lacking or inadequate because almost everything he did at the scene was

contrary to well-established law-enforcement practices and principles for handling such a call.

131.    Deputy Gallardo should have been trained to first try to communicate with Steve by phone to obtain an understanding of Steve's state of mind and what was happening inside the home and to develop a degree of rapport with Steve. Latrisha had given Steve's cell phone number to dispatch, who should have advised Deputy Gallardo of that fact, but Deputy Gallardo still should have been trained to request Steve's phone number and also Latrisha's and Lou Anne's numbers in case he could not reach Steve. Deputy Gallardo also could have asked Breanna or Vickie for Steve's phone number, or he could have asked one of them to call Steve for him. Instead, Deputy Gallardo recklessly proceeded to confront Steve directly and fatally with hardly any understanding of what was going on inside the home.

132.    It should have been obvious to Sheriff Babcock—and he must have been aware—that the highly predictable consequence of not having adequate training policies for Deputy Gallardo, a novice twenty-three-year-old officer, during his response to a call involving an armed, emotionally disturbed, mentally ill, and suicidal man in his home was that it would likely lead to a violation of Fourth Amendment rights such as Deputy Gallardo's warrantless entry into the Winder home and his fatally shooting Steve, which were avoidable with adequate training policies. *See, e.g.*, *Brown*, 219 F.3d at 459-61 (discussing obviousness of county's inadequate training of inexperienced, rookie reserve deputy sheriff likely leading to Fourth Amendment violation causing injury).

133.   Therefore, not having adequate training policies for Deputy Gallardo on responding to an armed, emotionally disturbed, mentally ill, and suicidal person in his home constitutes deliberate indifference to Steve's Fourth Amendment rights, and this deliberate indifference was the "moving force" that directly caused Plaintiffs' injuries. *See, e.g., Brown*, 219 F.3d at 462-465 (holding that county's inadequate training of inexperienced, rookie reserve deputy sheriff constituted deliberate indifference and was cause of plaintiff's injuries); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 539-41 (W.D. Tex. 2017) (finding that parents of decedent killed by city's police officers stated claim that police chief's deliberate indifference to adopting procedures to implement communication and de-escalation tactics in situations involving persons suffering from mental health issues was moving force in alleged constitutional violation); *see also McHenry v. City of Ottawa, Ks.*, No. 16-2736-DDC-JPO, 2017 WL 4269903, at *10-11 (D. Kan. Sept. 26, 2017) (plaintiffs adequately alleged deliberate indifference and causation on city's choice to not have training policies for officers to deal with mentally ill and suicidal persons); *Estate of Jones v. City of Spokane*, No. 2:16-CV-00325-JLQ, 2017 WL 438746, at *3 (E.D. Wash. Feb. 1, 2017) (finding sufficient plaintiffs' *Monell* allegations that city's inadequate policies for de-escalation and interaction with the mentally ill caused decedent's fatal shooting); *Tenorio v. Pitzer*, No. CV 12-01295 MCA/KBM, 2017 WL 4271331, at *4 (D. N.M. Sept. 25, 2017) (concluding that plaintiff's summary judgment evidence raised fact issue on causation on city's deficient training policies on de-escalation and use of

deadly force for people in emotional crisis where mentally ill, intoxicated, and suicidal man with a knife was shot by police).

COUNT 5
ADA VIOLATIONS

134.    Plaintiffs incorporate by reference the above allegations.

135.    Congress enacted the Americans With Disabilities Act (ADA) "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Public entities include "[a]ny State or local government" and "[a]ny department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

136.    To state a prima facie claim for discrimination under the ADA, a plaintiff must show: (1) he is a qualified individual within the meaning of the ADA; (2) he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination is by reason of his disability. *Melton v. Dallas Area Rapid Transit,* 391 F.3d 669, 671–72 (5th Cir. 2004). "Discrimination" under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...." *Id.* § 12112(b)(5)(A).

137.    Under the ADA, "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of an individual." 42 U.S.C. § 12102(1). Major depression is a mental impairment under the ADA, according to the EEOC Enforcement Guidelines in U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Enforcement Guidance on the ADA and Psychiatric Disabilities*, EEOC Notice No. 915.002 (Mar. 25, 1997).

138.    Steve Winder had major depression. In her call to the Young County Sheriff's Office, Latrisha told the dispatch operator that Steve had sent her photos with a gun to his head, that he said could not bear this anymore, that he had a history of depression and was on Prozac, and that around eleven years ago during his first marriage, he threatened suicide and was in a mental hospital for three days.

139.    Because major depression is a disability under the ADA, Young County therefore knew from Latrisha's call that Steve had a disability. Also, in his written statement, Deputy Gallardo stated, "Based upon the information I possessed[,] I believed that the person [Steve] had a mental illness." Deputy Gallardo planned "to take the suicidal person identified as Steve into custody without a warrant." Deputy Gallardo therefore knew that Steve had a disability. Despite this knowledge, in handling Latrisha's call and responding to Steve, Young County discriminated against Steve in two respects.

140.    First, Young County, through the Young County Sheriff's Office, discriminated against Steve by treating him like a criminal suspect, rather than like

a person with a disability, as evidenced by Deputy Gallardo's conduct at the scene and by fatally shooting Steve.

141.   Second, Young County failed to reasonably accommodate Steve's disability by:

- Failing and refusing to adopt a policy protecting the welfare of Steve, a person with a mental illness disability in a mental health crisis, therefore resulting in discriminatory treatment by Deputy Gallardo.

- Failing and refusing to adopt a policy for responding to threatened suicide calls with well-established crisis intervention techniques, including responding with a mental health professional, therefore resulting in discriminatory treatment by Deputy Gallardo.

142.   Young County's discrimination of Steve's disability caused his fatal shooting and Plaintiffs' injuries and damages.

143.   The exigent circumstances exception to the application of the ADA recognized in *Hainze v. Richards*, 207 F.3d 795, 801-02 (5th Cir. 2000) does not apply. As explained in Count 1, paragraphs 39-46 and 72-75, which are incorporated by reference, there were no exigent circumstances, and Young County should have reasonably accommodated Steve's disability.

144.   Plaintiffs therefore state a cause of action for Young County's violations of the ADA and seek recovery for Plaintiffs' injuries and damages caused by Young County's violations. *See McHenry*, 2017 WL 4269903, at *12-13 (denying motion to dismiss ADA claim in officer-shooting case); *Kaur v. City of Lodi*, 263 F. Supp. 3d 947,

978-81 (E.D. Cal. 2017) (denying summary judgment on ADA claim for officers' fatally shooting mentally ill man).

V.     DAMAGES

145.   Plaintiffs sue to recover the following damages:

1.   Noneconomic damages (survival damages) for Steve Winder's injuries that he sustained before he died and that were proximately caused by Defendants;

2.   Plaintiffs' economic and noneconomic damages for their injuries that they have sustained in the past and will likely sustain in the future arising out of Steve Winder's wrongful death and that were proximately caused by Defendants; and

3.   Punitive damages for Defendants' reckless and callous indifference to Plaintiffs' constitutional rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

VI.     JOINT AND SEVERAL LIABILITY

146.   Defendants are jointly and severally liable under Section 1983.

VII.   ATTORNEY FEES, LITIGATION EXPENSES, AND COSTS

147.   Plaintiffs seek recovery of their attorney fees, litigation expenses, including expert fees, and taxable costs under 42 § 1988(b).

VIII.  JURY DEMAND

148.   Plaintiffs request a trial by jury.

## IX.    PRAYER

149.   Plaintiffs pray that, upon final trial, Plaintiffs recover from Defendants their actual damages, an award of punitive damages, and attorney fees, expenses, prejudgment and postjudgment interest, and taxable costs.

Respectfully submitted,

CURNUTT & HAFER, L.L.P.


By: _/s/ Stephen W. Kotara_
Douglas R. Hafer
State Bar No. 00787614
DHafer@CurnuttHafer.com

Stephen W. Kotara
State Bar No. 11693200
SKotara@CurnuttHafer.com

301 West Abram Street
Arlington, Texas 76010
(817) 548-1000 - Telephone
(817) 548-1070 – Facsimile

*ATTORNEYS FOR PLAINTIFFS*