UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| LATRISH WINDER, et al., § § § | |
| Plaintiffs, § § | |
| v. § | Civil Action No. 7:23-CV-00059-O |
| § | |
| JOSHUA M. GALLARDO, et al., § § § | |
| Defendants. § | |

# OPINION & ORDER

Before the Court are Defendants' Motion to Dismiss (ECF No. 8), filed August 22, 2023; Plaintiffs' Response (ECF No. 14), filed September 22, 2023; Defendants' Reply (ECF No. 20), filed October 13, 2023; Plaintiffs' Supplemental Brief (ECF No. 26), filed November 27, 2023; and Defendants' Supplemental Response (ECF No. 27); filed December 11, 2023. Also before the Court are Plaintiffs' Motion to Strike (ECF No. 17) filed September 25, 2023; Defendants' Response (ECF No. 21), filed October 16, 2023; and Plaintiffs' Reply (ECF No. 22), filed October 24, 2023.

As an initial matter, the Court addresses Plaintiffs' Motion to Strike Deputy Sherriff Joshua M. Gallardo's ("Deputy Gallardo") bodycam video, which the Defendants submitted with their Motion to Dismiss. Having relied only upon facts as alleged in Plaintiffs' Complaint to rule on Defendants' Motion to Dismiss, Plaintiffs' Motion to Strike (ECF No. 17) is hereby **DENIED for mootness**.

1

## I.  BACKGROUND[1]

On a Sunday afternoon, Steve Winder ("Winder") and his family members were swimming in Winder's pool. Winder, who had been drinking, accidentally got in the pool with his cell phone. Seeking to find a phone that worked, Winder went inside his home, found, and charged an old phone that belonged to his wife Latrisha ("Latrisha"), who at the time was in the United States National Guard and in Fort Lee, Virginia for training. Winder discovered Facebook messages on Latrisha's phone between Latrisha and her ex-husband. In the messages, Latrisha's ex-husband expressed a desire to reconcile with Latrisha. Latrisha declined her ex-husband's invitation, but never told Winder about these messages. Winder, presumably upset about the messages, took Latrisha's phone next door to his mother-in-law, Lou Anne Phillip's ("Mrs. Phillips") house. Mrs. Phillips pointed out that the messages showed that Latrisha did not want to get back together with her ex-husband. Winder agreed and went back to his house. Later that evening, Mrs. Phillips received text messages from Latrisha—who was in Virginia at the time—expressing concern for Winder because she could not reach him, and because he had a history of excessive drinking and mental illness. Mrs. Phillips then went over to Winder's house to check on him. Around 7:00 PM that night, Mrs. Phillips received another call from Latrisha, who told Mrs. Phillips that Winder had sent her photos of a handgun under his chin and to his head, stating that "he could not bear it anymore." At Latrisha's request, Mrs. Phillips went over to Winder's house to check on him again. Mrs. Phillips reported that Winder was not suicidal and that the situation was under control.

Around the same time, Latrisha also called the Young County Sherriff's Department and asked for a welfare check on her husband. The dispatcher noted that Winder had a gun and had sent Latrisha a photo of himself holding the gun while saying "he could not bear it anymore."

---

[1] Unless otherwise indicated, these facts are taken from those alleged in the Complaint (ECF No. 1).

2

Young County Sheriff Deputies Gallardo and Simon Dwyer ("Deputy Dwyer") were dispatched to the Winder home. Deputies Gallardo and Dwyer drove separate vehicles. Deputy Gallardo arrived at the Winder home first, where he encountered Winder's niece who escorted him to the front door. At this time, Mrs. Phillips was still accompanying Winder in his bedroom. After realizing that Deputy Gallardo was outside the door, Mrs. Phillips tried to retrieve the gun from Winder. But this upset Winder. He responded "I don't give a [expletive]. This is my home" and proceeded to grab his gun and sit in his chair catty-corner from the bedroom door.

Deputy Gallardo then opened the front door, announcing himself with "Hello Sherriff's Office," and yelling for "Steve." Mrs. Phillips simultaneously opened the bedroom door, calmly answered "we're right here. Can I help you?" and indicated that Winder and everyone else was alright. Shortly thereafter, Mrs. Phillips saw Winder get up from his chair and walk toward the doorway with the gun. Mrs. Phillips told Winder to "put it up," and then told Deputy Gallardo "He's got a gun." After this, Mrs. Phillips did not look at Winder again until after he was shot. Mrs. Phillips never saw Winder point his gun at Deputy Gallardo, but she initially believed Winder was holding a gun in the bedroom doorway. Winder was not visible on Deputy Gallardo's bodycam video. After Mrs. Phillips said, "He's got a gun," Deputy Gallardo said on his radio, "He's got a gun. He's got a gun" and "Put it down, man. Put it down." Deputy Gallardo then fired one shot from his handgun that hit Winder in the chest as he was standing next to the bedroom doorway.

Deputy Dwyer arrived on the front porch about forty seconds after Deputy Gallardo shot Winder. Upon entering Winder's bedroom, examining the scene, and noticing Winder on the floor at the foot of the bed, Deputy Dwyer pointed at a gun on the far back corner of the bed opposite to where Winder had been standing when he was shot and asked Deputy Gallardo if that was "the gun." Deputy Gallardo responded affirmatively. Based on the location of Winder's gun after the

3

shooting and the fact that Mrs. Phillips did not see Winder point a gun a Deputy Gallardo, Plaintiffs contend that Winder was unarmed at the time Deputy Gallardo shot him.

Deputy Dwyer apologized to Mrs. Phillips and Latrisha, who was on Facetime, saying "I apologize I couldn't have got here any quicker than I did."

On June 6, 2023, Latrisha and Winder's four children ("Plaintiffs") filed this Section 1983 action against Deputy Gallardo, the Sheriff of Young County, Texas, Robert Travis Babcock ("Sheriff Babcock"), and Young County, Texas (collectively, "Defendants"), alleging causes of action for (A) warrantless entry, (B) excessive force, (C) supervisory liability, (D) *Monell* Liability, and (E) Americans with Disabilities Act ("ADA") violations. Defendants filed a Motion to Dismiss, which is now ripe for review.[2]

## II. LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Rule "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy this standard, the defendant may file a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The

---

[2] Defs.' Mot. to Dismiss, ECF No. 8; Pls.' Resp., ECF No. 14; Defs.' Reply, ECF No. 20.

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). A court may not accept legal conclusions as true, but when well-pleaded factual allegations are present, a court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.* at 678–79.

### B. Qualified Immunity

The doctrine of qualified immunity protects government officials sued under Section 1983 "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* This doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Deciding whether an official is entitled to qualified immunity requires a court to apply the two-pronged analysis established in *Saucier v. Katz*. 533 U.S. 194 (2001). Courts have discretion to decide which of the two prongs should be addressed first in light of the circumstances of each particular case. *Pearson*, 555 U.S. at 236, 242 ("[T]he judges of the district courts and the courts of appeals are in the best position to determine the order of decision making that will best facilitate the fair and efficient disposition of each case.").

The first prong of the *Saucier* analysis asks whether the facts alleged or shown are sufficient to make out a violation of a constitutional or federal statutory right. *Saucier*, 533 U.S. at 201. If the plaintiff's allegations, viewed favorably, do not set out a legitimate claim for relief for violation

of a right, no further inquiry is necessary. *Id.* On the other hand, if the plaintiff sufficiently pleads or establishes the violation of a constitutional or federal statutory right, a court must decide whether that right was clearly established at the time of the government official's alleged misconduct. *Id.* This requires a determination of whether a defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County*, 543 F.3d 221, 225 (5th Cir. 2008) (cleaned up). If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley*, 475 U.S. at 341; *see also Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Conversely, an officer's conduct is not protected by qualified immunity if, considering clearly established pre-existing law, it was apparent that the officer's conduct, when undertaken, would be a violation of the right at issue. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Jones v. City of Jackson*, 203 F.3d 875, 879 (5th Cir. 2000). "The critical consideration is fair warning." *Taylor v. LeBlanc*, 68 F.4th 223, 228 (5th Cir. 2023).

Therefore, "[t]o surmount this [qualified immunity] barrier at the motion to dismiss stage, the plaintiffs must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm they have alleged and that defeat a qualified immunity defense with equal specificity." *Torns v. City of Jackson*, 622 Fed. App'x 414, 416 (5th Cir. 2015) (cleaned up).

### III. ANALYSIS

#### A. Warrantless Entry

Plaintiffs argue that Deputy Gallardo's warrantless entry in the Winder home was not justified, violating Winder's constitutional rights.[3] In response, Defendants assert qualified

---

[3] Compl. ¶ 77, ECF No. 1.

immunity on grounds that Deputy Gallardo did not enter the residence, and even if he did enter the Winder home, he was invited to enter, which does not violate Winder's constitutional rights. At this stage, the Court takes Plaintiffs allegations that Deputy Gallardo entered the Winder home as true.[4] The Court will begin by addressing the first prong required to overcome qualified immunity, which considers whether the facts alleged, taken in the light most favorable to the plaintiff, show a violation of a constitutional right. *Saucier*, 533 U.S. at 200.

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398 (2006) (cleaned up). However, an exception exists for a warrantless entry into a residence under exigent circumstances, which applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (citation omitted); *see also Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("[A]bsent consent or exigency, a warrantless search of the home is presumptively unconstitutional."). "The Government bears the burden of demonstrating exigent circumstances." *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008).

Suicide risk is generally considered an exigent circumstance. *See Clark v. Thompson*, 850 F. App'x 203, 210-11 (5th Cir. 2021); *Rice v. ReliaStar Life Ins.*, 770 F.3d 1122, 1131 (5th Cir. 2014). "If an individual poses a threat to himself, that 'may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment.'" *Clark*, 850 F. App'x at 210 (quoting *Rice*, 770 F.3d at 1131). The Fifth Circuit requires that the officer's belief that a person is imminently at risk of seriously injuring himself be objectively reasonable. *Rice*, 770 F.3d at 1132.

In *Rice*, the court found that a deputy did not violate the plaintiff's Fourth Amendment rights when he entered a decedent's home without a warrant with knowledge that the decedent was

---

[4] *Id.* at ¶¶ 49–50.

suicidal, had a gun, had been drinking, and was sitting in his truck holding a gun to his head. *Id.* Similarly, in *Clark*, the Fifth Circuit upheld the district court's finding that the officers acted reasonably in entering the plaintiff's home without a warrant "because they were responding to a call about [the plaintiff] being a possible suicide threat and found the pills he was allegedly planning to use to commit suicide." *Clark*, 850 F. App'x at 210. The Fifth Circuit held that "[w]ith information that [the plaintiff] was a suicide risk and had the means to act on it (pills), [the defendant-officer] could have reasonably believed there was not sufficient time to obtain a warrant before taking [the plaintiff] into custody." *Id.* at 211 (cleaned up). The court further held that "[t]he exigency of a credible risk that a person is about to end their life justifies the warrantless entries into [the plaintiff's] hotel room and home." *Id.*

The facts of *Rice* and *Clark* resemble those presented here. Deputy Gallardo did not violate Winder's Fourth Amendment rights when he allegedly entered the Winder home without a warrant because he did so with an objectively reasonable belief that there was an imminent threat of Winder seriously injuring himself. Deputy Gallardo was dispatched to the Winder home by a call describing a suicidal male possibly in possession of a gun.[5] His alleged warrantless entry was therefore prompted by credible information that Winder both "was a suicide risk *and* had the means to act on it." *Clark*, 850 F. App'x at 211 (emphasis added). Based on these facts, as alleged in Plaintiffs' Complaint, it was objectively reasonable for Deputy Gallardo to believe he needed to protect Winder from imminent injury.[6]

Under such circumstances, it was objectively reasonable for Deputy Gallardo to believe that there was not sufficient time in which to secure a warrant before entering the Winder home.

---

[5] Compl. ¶ 40, ECF No. 1.
[6] *Reitz v. Woods*, 85 F.4th 780 (5th Cir. 2023) does not change this outcome. In *Reitz*, the officers knew from their post-entry investigation that the initial 911 call was inaccurate and that the plaintiff only had a pellet gun. The Fifth Circuit held that officers "may not disregard facts tending to dissipate probable cause." *Id.* at 791. Here, Officer Gallardo had no such information, and his investigation after arriving at the Winder residence revealed the 911 call was accurate and that Winder did have a gun.

8

Therefore, exigent circumstances existed to justify making a warrantless entry into the Winder residence, and Winder's Fourth Amendment rights were not violated. Accordingly, Plaintiffs' warrantless entry claims should be **DISMISSED**.

### B. Excessive Force

Next, Plaintiffs bring a claim against Deputy Gallardo for excessive force. Fourth Amendment excessive force claims are analyzed under a reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). To prevail on his Fourth Amendment excessive force claim, Plaintiffs must establish "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (cleaned up).

The "reasonableness" prong is an objective inquiry: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In deadly force claims, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). "The excessive force inquiry is confined to whether the [officer or another person] was in danger at the moment of the threat that resulted in the [officer's use of deadly force]." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001) (citing *Fraire v. City of Arlington*, 957 F.2d

9

1268, 1276 (5th Cir. 1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.")).

"A police officer does not have to permit a suspect to aim his weapon before answering the threat." *Jones v. Shivers*, 697 F. App'x 334 (5th Cir. 2017) (citing *Salazar-Limon v. City of Hous.*, 826 F.3d 272, 279 n.6 (5th Cir. 2016)). As the Fifth Circuit noted in *Salazar-Limon*, "we have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." 826 F.3d at 279 n.6. And it must be re-emphasized in this particular context that "[t]he question is one of 'objective reasonableness,' not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight." *Manis*, 585 F.3d at 843 (citations omitted).

Thus, the relevant inquiry is whether Deputy Gallardo reasonably perceived a threat of serious physical harm to himself or his fellow officers at the time he discharged his weapon. This analysis is limited to only the circumstances in existence when Deputy Gallardo made the decision to discharge his weapon. *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) ("We need not look at any other moment in time."); *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) ("[A]ny of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit.").

Generally, it is unreasonable for an officer to shoot a suspect the officer knows is unarmed and not aggressive. *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021); *see also Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019). "But if the officer believes the suspect has a gun, the calculation changes—even if there was never, in fact, a gun." *Allen v. Hays*, 65 F.4th 736, 745 (5th Cri. 2023). An officer's use of deadly force may be reasonable when the officer could reasonably believe the suspect was reaching for or had a weapon. *See Ontiveros v. City of Rosenberg*, 564

F.3d 379, 385 (5th Cir. 2009) (finding that an officer did not use excessive force even though a subsequent search of the bedroom revealed no weapons); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) (finding that police did not use excessive force when a decedent repeatedly refused to keep hands raised and appeared to be reaching for an object, despite the "fact that [the decedent] was actually unarmed"). But an officer is not free from liability just because he claims to have seen a gun. Rather, the ultimate "question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances." *Allen*, 65 F.4th at 748.

Applying these standards, the Court concludes that Deputy Gallardo's shooting of Winder was reasonable. At this stage, the Court takes Plaintiffs' factual assertion that Winder was unarmed at the time Deputy Gallardo shot him as true. But it is nonetheless irrelevant. As described in Plaintiffs' Complaint, Winder got out of his chair, grabbed his gun, and walked toward the bedroom door while yelling.[7] Mrs. Phillips told Deputy Gallardo that Winder was armed. Indeed, Mrs. Phillips *herself* believed that Winder had a gun at the time of the shooting.[8] Upon seeing Winder come out of the bedroom, Deputy Gallardo immediately reported on his radio that "He's got a gun" and commanded him to "Put it down" multiple times.[9]

Even if Winder was unarmed, Deputy Gallardo could not have known this. To the contrary, Deputy Gallardo believed, just as Mrs. Phillips did, that Winder was armed in the very moment he yelled "He's got a gun. He's got a gun." Under these circumstances, a reasonable officer could fear for his safety and that of others nearby. Based on Ms. Phillip's comments, Deputy Gallardo could have reasonably believed that Winder had a gun and was about to fire it in the close quarters of the home—meaning he had probable cause to believe that Winder "pose[d] a threat of serious physical

---

[7] Compl. ¶¶ 52–54, ECF No. 1.
[8] *Id.* at ¶¶ 90–91.
[9] *Id.* at ¶ 55.

11

harm." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In this instance, Deputy Gallardo was justified in using deadly force to defend himself and others around him.

The Fifth Circuit decisions in *Allen* and *Waller* are not to the contrary. In *Allen*, the decedent did not have a gun, there was not a gun in his car or his vicinity, the officer had no reason to believe that the decedent had a gun, and the decedent never moved his hands out of the officer's line of sight. *Allen*, F.4th at 745. Likewise, in *Waller* "the plaintiffs' specific and detailed factual pleadings about the crime-scene evidence make plausible their allegation that [the decedent] followed the [officer's] commands, put down his weapon, and was unarmed when the [officer] shot him." *Waller*, 922 F.3d at 601. In *Allen* and *Waller*, the plaintiffs plausibly alleged that the officers had actual knowledge that the decedents were unarmed and not aggressive. For Deputy Gallardo, all the signs pointed to the contrary.

Therefore, the Court concludes that Deputy Gallardo did not violate Winder's Fourth Amendment protection against unreasonable seizure since Deputy Gallardo's use of force against Winder was justified and reasonable. Accordingly, Plaintiffs' excessive force claims should be **DISMISSED**.

### C. Supervisory Liability

Plaintiffs also bring a Fourth Amendment failure-to-supervise claim against Sherriff Babcock. "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (citation omitted). To establish Section 1983 supervisory liability against Sheriff Babcock, Plaintiffs must show that "(1) the police chief failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's

constitutional rights." *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). In the Complaint, Plaintiffs fail to sufficiently plead facts in support of the third element.

"Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010) (citation omitted). To establish deliberate indifference, a plaintiff must usually demonstrate a pattern of similar violations. *Id.* However, a plaintiff can still establish deliberate indifference—even without evidence of a pattern of violations—under the single incident exception. *Id.* at 549. This exception is narrow and requires evidence "that the *highly predictable consequence* of a failure to train [or supervise] would result in the specific injury suffered, and that the failure to train [or supervise] represented the moving force behind the constitutional violation." *Id.* (cleaned up) (emphasis in original).

The Fifth Circuit has held that failing to respond to a history of "bad or unwise acts" that "demonstrate lack of judgment, crudity, and, perhaps illegalities" is not enough for deliberate indifference. *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (cleaned up). On the other hand, a policymaker's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997) (citation omitted). "[E]ven a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Bryan Cnty.*, 520 U.S. at 407).

13

Plaintiffs do not allege or produce any facts about similar incidents and thus appear to seek to establish liability under the single incident exception.[10] So Plaintiffs must demonstrate deliberate indifference under the single incident rule. Plaintiffs argue that: (1) the lack of an on-duty supervisor while Deputy Gallardo was on his way to the Winder residence "gives a plausible inference to Sheriff Babcock's deliberate indifference"; (2) Sherriff Babcock knew that Deputy Gallardo needed greater training and supervision because of his history of poor judgment; (3) Deputy Dwyer's apology to Mrs. Phillip's for not getting to the scene sooner "further evidences Sheriff Babcock's deliberate indifference to having Deputy Gallardo adequately trained and properly supervised"; and (4) Sheriff Babcock's experience as a peace officer for over ten years as well as additional training made him aware that the fatal shooting of a mentally ill person is avoidable with proper training and supervision.[11]

But in the absence of a prior incident, the training and supervisory deficiencies must have been so obvious that the shooting here would have appeared to Sheriff Babcock as a "highly predictable consequence." *Valle*, 613 F.3d at 549 (requiring more proof of the possibility of recurring situations than that sending a rookie trained officer to a situation involving mental health individuals would likely constitute the use of excessive force).

The Court finds no evidence in Plaintiffs' Complaint or pleadings to support that Sherriff Babcock was aware that a shooting such as this was a highly predictable result of the training and supervision being provided. First, this was not a "narrow and extreme" incident, necessary to show deliberate indifference. *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 627 (explaining that "deliberate indifference can be inferred only in narrow and extreme circumstances."). As discussed at-length above, the Fifth Circuit has routinely upheld the use of force in cases when an officer

---

[10] Pls' Resp. 45, ECF No. 14.
[11] Compl. ¶ 109–15, ECF No. 1

14

reasonably believes that a decedent has a gun. Next, Plaintiffs did not allege high predictability in the form of a pattern of violations or the proclivities of Deputy Gallardo. Instead, Plaintiffs merely allege that Gallardo had poor judgment, that Deputy Dwyer apologized to Mrs. Phillips, and that Sherriff Babcock received substantial training on crisis intervention. Without more, Plaintiffs have not produced any facts, taken as true, that can sustain a holding that Sherriff Babcock was deliberately indifferent here.

Having found insufficient facts to support a pattern or single incident exception, the Court finds that Plaintiffs have failed to demonstrate a plausible claim of supervisory liability. Accordingly, Plaintiffs' claims against Sherriff Babcock for supervisory liability should be **DISMISSED**.

### D. *Monell* Liability

Plaintiffs additionally brings a municipal liability claim against Young County under Section 1983. "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "'[I]t is well established that there must be an underlying constitutional violation for there to be a claim under *Monell*.'" *Landry v. Laborde-Lahoz*, 852 Fed. App'x 123, 127 (5th Cir. 2021) (quoting *Taite v. City of Fort Worth Texas*, 681 F. App'x 307, 309 (5th Cir. 2017)).

Because the Court holds that Winder's constitutional rights were not violated, Plaintiffs' claims against Young County for municipal liability should be **DISMISSED**.

### E. ADA Violations

Finally, Plaintiffs allege that Young County discriminated against Winder under Title II of the ADA.[12] To prevail under this statute, a plaintiff must show: "(1) that he has a qualifying

---

[12] Compl. ¶ 140, ECF No. 1.

disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).

Plaintiffs assert that (1) Young County discriminated against Winder through Deputy Gallardo's conduct and (2) Young County failed to accommodate Winder. Defendants argue that the ADA does not apply because Deputy Gallardo faced exigent circumstances.[13]

The ADA does not reach an officer's conduct when they act in the face of exigent circumstances. *See Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). In *Hainze*, police officers received a call from a woman requesting that the police transport her suicidal nephew to a hospital for mental health treatment. The woman told the police that "[the plaintiff] had a history of depression and was under the influence of alcohol and anti-depressants, carrying a knife, and threatening to commit suicide or 'suicide by cop.'" *Id.* at 797. Two officers were dispatched to a convenience store where the plaintiff was located. Upon their arrival, the officers saw the plaintiff standing by the passenger door of an occupied truck. The plaintiff appeared to be holding the truck door handle and talking to the truck occupants. In response, one officer got out of his car, drew his weapon, and ordered the plaintiff to move away from the truck. While holding a knife, the plaintiff responded with profanities and walked towards the officer. The officer ordered the plaintiff to stop, but he did not. When the plaintiff was within a few feet of the officer, that officer shot him twice in the chest. *Id.*

The *Hainze* plaintiff *then* claimed that the county failed to reasonably accommodate his disability under the ADA. The Fifth Circuit held that "Title II [of the ADA] does not apply to an officer's on-the-street responses to reported disturbances, whether or not those calls involve

---

[13] Defs.' Mot. to Dismiss 18, ECF No. 8.

subjects with mental disabilities," until the responding officer has "secur[ed] the scene" and "ensur[ed] that there is no threat to human life." *Id.* at 801. In particular, "in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians," police officers are not required to comply with the ADA. *Id.*

When Deputy Gallardo entered the Winder residence here, he reasonably believed Winder may have been armed, was then told by Mrs. Phillips that Winder was armed, heard Winder making aggressive comments, and saw Winder exit the bedroom door and move toward him.[14]

Based on these facts as alleged in Plaintiffs' Complaint, Deputy Gallardo was justified in his belief that the scene was not secure and that Winder posed a danger to his life and others. Indeed, Deputy Gallardo had "to instantaneously identify, assess, and react" to a potentially life-threatening situation. *Hainze*, 207 F.3d at 801. "To require [Gallardo] to factor in whether [his] actions are going to comply with the ADA, in the presence of [these] exigent circumstances and prior to securing the safety of [himself, Mrs. Phillips, Winder] and any nearby civilians, would pose an unnecessary risk to innocents." *Id.* Therefore, Deputy Gallardo's conduct at the scene does not give rise to claim under Title II of the ADA. Plaintiffs' claims against Young County for ADA violations should be **DISMISSED**.

---

[14] Compl. ¶¶ 52–55, ECF No. 1.

## IV. CONCLUSION

For the reasons stated above, it is **ORDERED** that Defendants' Motion to Dismiss (ECF No. 8) should be and is hereby **GRANTED** for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6) and that all claims alleged against Defendants in Plaintiffs' Complaint (ECF No. 1) are hereby **DISMISSED**. Plaintiffs may seek leave to amend their claims **no later than January 8, 2024**.

**SO ORDERED** on this **18th day** of **December, 2023**.

_____
Reed O'Connor
UNITED STATES DISTRICT JUDGE